

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| SHERICE RENEE MILLER-WEAVER, | ) | |
| | ) | |
| Respondent, | ) | |
| v. | ) | **WD85078** |
| | ) | |
| | ) | **OPINION FILED:** |
| DIEOMATIC INCORPORATED, d/b/a | ) | **December 13, 2022** |
| LMV AUTOMOTIVE SYSTEMS, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri
The Honorable Janet Sutton, Judge**

**Before Division Three:** Karen King Mitchell, Presiding Judge, and
Cynthia L. Martin and Anthony Rex Gabbert, Judges

Dieomatic Incorporated, d/b/a LMV Automotive Systems (LMV), appeals, following a jury trial, the judgment in favor of plaintiff below, Sherice Renee Miller-Weaver (Weaver), on her claims for actual and punitive damages based on (1) racially hostile work environment under the Missouri Human Rights Act §§ 213.010-213.137 (MHRA);[1] and (2) failure to issue a proper

---

[1] All statutory references are to the Revised Statutes of Missouri (2016), unless otherwise specified.

service letter under § 290.140.1, which resulted in a judgment against LMV of $1,225,001.00[2] plus attorneys' fees and costs.

LMV raises four points on appeal. In its first point, LMV argues that the trial court should have instructed the jury using the MHRA's "motivating factor" causation standard, based on a 2017 amendment to the MHRA effective August 28, 2017, instead of the previous "contributing factor" standard because Weaver's hostile work environment claim accrued after August 28, 2017.[3] LMV's second point, also based on the 2017 MHRA amendments, argues that the trial court should have enforced the $500,000 damage cap in § 213.111.4(2)(d), effective August 28, 2017, because Weaver's hostile work environment claim accrued after August 28, 2017. In its third point, LMV argues that the trial court should not have entered judgment for Weaver on her "racial harassment" claim because she failed to plead a claim of racial harassment or racially hostile work environment in her petition. In its fourth point, LMV argues that the punitive damages award on Weaver's service letter statute claim was not supported by clear and convincing evidence. Finding no merit in LMV's arguments, we affirm.

**Background**[4]

LMV, located in Liberty, Missouri, manufactures component parts for automobile manufacturers. On April 13, 2015, LMV hired Weaver, an African-American woman, as a human resources (HR) coordinator and, shortly afterward, promoted her to the position of senior HR

---

[2] The judgment awarded Weaver $50,000 actual and $1,000,000 punitive damages on her racially hostile work environment claim; $1 actual and $175,000 punitive damages on her service letter claim; $516,879.38 in attorney's fees; and $10,177.89 in costs.

[3] Section 213.055.1(1)(a) prohibits an employer's discrimination against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." In interpreting the pre-amendment version of the MHRA, courts defined "because of," as it relates to an adverse decision or action, as the "contributing factor" in that decision or action. *E.g.*, *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820 (Mo. banc 2007). As of August 28, 2017, § 213.010(2) defined "because of" to mean the "motivating factor."

[4] "We view the evidence in the light most favorable to the jury's verdicts, disregarding all contrary evidence and inferences." *State v. Jackson*, 636 S.W.3d 908, 913 n.1 (Mo. App. W.D. 2021).

2

coordinator. She reported directly to the HR manager who, during her employment, was Ken McIsaac until October 31, 2016, and Robert Clemens thereafter. At all times during Weaver's employment, Andy Hrasky was either the assistant general manager or the general manager of LMV. In his position as general manager, Hrasky terminated Weaver's employment on November 14, 2017.

Weaver testified that, by early 2016, she had noticed things that were "not right" at LMV. She first noticed white employees, mostly men but some women, not responding to her when she greeted them or spoke to them. She stated that they would not shake her hand but pulled away as if they did not want her to touch them. Weaver also testified about other occurrences at LMV in 2016, including (1) T-shirts worn by temporary LMV workers that had Confederate flags on them; (2) a hat with a Confederate flag on it that was worn into a company-wide meeting by a member of LMV's "fairness committee," created by LMV to address employee concerns; (3) a truck, driven by an LMV employee and parked in its lot every day, with a large Confederate flag attached to the back on a pole; (4) a swastika emblem inside an employee's toolbox; and (5) complaints made to her by African-American workers that their training was made more difficult due to racism.

Those concerns and others were raised in a lengthy email Weaver sent to McIsaac on August 11, 2016. Weaver and her HR colleague Mahasin Pledger, who is also African-American, had met with McIsaac and Hrasky the day before to discuss their concerns of racism, particularly the presence of Confederate flags on an employee's truck and on clothing. Weaver stated that she had hoped to get the support of LMV senior management to denounce racism but that both men were defensive in the August 10 meeting. Hrasky told Weaver that some of their concerns were not valid and that the Confederate flag "thing" was not "necessarily bad." Both men later testified that the Confederate flag was offensive to "some people."

Weaver testified that she had been thinking about sending her August 11 email for a couple of months but was concerned that complaining could lead to her termination. She started the email by explaining that the events mentioned in it were examples of the "types of things we have been dealing with" and that she and Pledger were "discriminated against weekly and lately it's been daily." She ended the email to McIsaac with the following statement:

> I am not in any way implying that you are racist or have ever treated me with racist intent but . . . the things that happen to us are being allowed and we are not being protected like others. We are committed to LMV. But we need LMV to support us as well. . . . [W]e would like to sit down with you and discuss this information and hopefully come to a place of mutual respect and understanding.

Her email detailed ongoing complaints of improper treatment, including the following: (1) being questioned about the way she looked, smiled, and greeted white workers; (2) being expected to work harder, longer, and more frequently on-site (rather than remotely) than white employees with similar responsibilities; (3) she and Pledger being treated with "clear disrespect" and "made to feel less than equal" to white employees, all while having to "make sure we never get upset"; (4) having to contend with employees who display the Confederate flag and KKK emblems on clothing and vehicles, giving the appearance that LMV supported such displays; and (5) bringing complaints of racism to LMV management and either being ignored or told offensive comments were just "dry humor."

Hrasky labeled Weaver's email a "diatribe" and admitted he was not sure he even read all of it. He testified that he saw "no reason to change anything." Weaver testified that nothing changed after the meeting and email, there was no investigation into her complaints, and the problems persisted. Sometime after October 31, 2016, when Clemens replaced McIsaac as HR manager, Weaver again complained about a truck bearing the Confederate flag, this time to

4

Clemens. Clemens testified that he walked through the parking lot that day, did not see the truck or the flag, and did not hear from Weaver again about it.

Although Weaver had received an "A" performance evaluation in June 2016, being praised for her job knowledge and dependability, she was downgraded to a "B" in her September 2017 review. Weaver, upset about what she believed to be false statements in the 2017 review, refused to sign it. In October 2017, Weaver was criticized by a white employee for having created a "ghetto" flyer for a Halloween "trunk or treat" company event,[5] which Weaver then reported to Clemens. By that point, Weaver had advised David Worrall, LMV's vice president of HR, of her concerns about "the hostile bully environment we work in every day." On October 16, 2017, she told Worrall, "This is really out of control and I need assistance." In an email to Clemens on November 7, 2017, Weaver stated, "Racism at LMV is heavily present as has been for years. . . . This mindset is what we deal with every day and it's all around us."

On November 14, 2017, Hrasky fired Weaver. On November 21, 2017, Weaver sent a certified letter to Hrasky asking for a letter of dismissal under the service letter statute, § 290.140. Clemens testified that he drafted the letter and emailed it to Hrasky for signing on January 25, 2018, then gave the signed letter to "our administrative assistants" to mail on January 26, 2018. Weaver testified that she never received the letter. On February 8, 2018, Weaver filed her charge of discrimination against LMV with the Missouri Commission on Human Rights (MCHR). On October 30, 2018, after receiving a right-to-sue letter, she filed a four-count petition, naming as defendants LMV and Clemens and claiming race discrimination, sex discrimination, retaliation, and violation of the service letter statute; she attached to the petition her February 8, 2018 charge

---

[5] This is the only discriminatory act alleged by Weaver that originated after August 28, 2017.

of discrimination with the MCHR. Weaver dismissed her claims against Clemens and her claim of sex discrimination at the close of evidence in trial.

Weaver's petition alleged the following in support of her claim of race discrimination:

1. As an African-American female, she was a member of a protected class;

2. She was paid less than other senior HR employees because of her race;

3. Her supervisor did not give her credit for her ideas or allow her to implement them;

4. She was given less preferential treatment than similar HR employees because of her race;

5. Racist emblems, including the Confederate flag and KKK symbols, were on-site at LMV, and discrimination was occurring within the LMV plant;

6. She was downgraded in her annual evaluation after she complained of discrimination at LMV, when she had received excellent evaluations previously; and

7. Her MCHR Charge of Discrimination, referred to in Paragraph 7 of her petition and attached as "Exhibit A" thereto, alleged the above facts and marked the "date of discrimination" box to indicate it was a "continuing action."

Weaver first described her claim as one of a "hostile work environment" in response to LMV's pre-trial motion for summary judgment. LMV argued that her claims were time-barred, and Weaver argued that they were timely under the continuing violation theory of accrual. The trial court[6] agreed with Weaver, denying LMV's summary judgment motion.

The trial court overruled LMV's objections at trial about the use of the "contributing factor" standard in the court's verdict-directing instruction on Weaver's hostile work environment claim. The jury found in Weaver's favor on her claims of a racially hostile work environment and

---

[6] After the trial of this case, Judge Sutton left the Clay County Circuit Court and was appointed to this court. Judge Sutton has not participated in this appeal.

failure to issue a proper service letter; the jury found for LMV on Weaver's claim of retaliation. The trial court denied all of LMV's post-trial motions and entered judgment in Weaver's favor on her hostile work environment and service letter statute violation claims.

**Analysis**

LMV raises four claims. In its first and second points, LMV argues that the trial court erred in not applying the 2017 MHRA statutory amendments to Weaver's hostile work environment claim, specifically for not applying the heightened "motivating factor" standard to her substantive claim (Point I) and for not applying the damages cap imposed by the 2017 amendment (Point II). For its third point, LMV argues that Weaver failed to plead in her petition the claim of racial harassment or hostile work environment and thus the claim of hostile work environment should not have been submitted to the jury. In its fourth point, LMV argues that there was insufficient clear and convincing evidence to support the award of punitive damages for LMV's service letter violation.

**I.      The trial court properly instructed the jury, applying the pre-2017 version of the MHRA to Weaver's claims of hostile work environment.**

"[T]he standard of review in determining whether a jury is properly instructed is a question of law subject to *de novo* review." *SKMDV Holdings, Inc. v. Green Jacobson, P.C.*, 494 S.W.3d 537, 558 (Mo. App. E.D. 2016). LMV claims that the trial court erred in instructing the jury, using MAI 38.01(A), on Weaver's racially hostile work environment claim, based on the pre-2017 MHRA causation standard requiring that race be a "contributing factor" in the defendant's conduct. Instead, LMV claims, the trial court should have instructed the jury using MAI 38.06 because Weaver's claims accrued after August 28, 2017, and the MHRA standard in effect as of

7

August 28, 2017, required that race be a "motivating factor."[7] We disagree that the heightened standard adopted in 2017 applies.

The 2017 amendments to the MHRA cannot be applied retrospectively. Article 1, § 13 of the Missouri Constitution prohibits laws that are "retrospective" in operation. A law is retrospective if it "impairs some vested right or affects past transactions to the substantial prejudice of the parties." *Holmes v. Steelman*, 624 S.W.3d 144, 155 (Mo. banc 2021) (quoting *La-Z-Boy Chair Co. v. Dir. of Econ. Dev.*, 983 S.W.2d 523, 525 (Mo. banc 1999)). Under § 1.150, new statutes are presumed to operate prospectively unless "otherwise expressly provided." In other words, the statute is applied prospectively unless it is "merely procedural or remedial" rather than substantive or if "the legislature clearly expresses an intent that the amendment be given retroactive application." *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 795 (Mo. App. W.D. 2018). In *Bram*, this court found that the 2017 amendments to the MHRA were substantive and must be applied prospectively only. *Id.* A plaintiff's right to recovery for an injury is "governed by the statutes in effect at the time of the injury." *Gervich v. Condaire, Inc.*, 370 S.W.3d 617, 624 (Mo. banc 2012). Therefore, the issue here is when Weaver's hostile work environment claim resulted in injury and whether that was before or after August 28, 2017.

Section 213.075.1 requires that the plaintiff file a charge of discrimination within 180 days of the alleged discriminatory act. Section 213.111.1 requires that MHRA claims "be filed . . . no later than two years after the alleged cause occurred or its reasonable discovery by the alleged injured party." With most hostile work environment claims, the discriminatory acts are not themselves "significant events"; it is the cumulative effect of the day-to-day harassment that is significant. *Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 526 (Mo. App. E.D. 2009);

---

[7] Revised Missouri Approved Instructions were adopted in 2018 for MHRA claims accruing after the August 28, 2017 effective date of the amendments.

*Pollock v. Wetterau Food Distrib. Grp.*, 11 S.W.3d 754, 763 (Mo. App. E.D. 1999). The unlawful employment practice "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v Morgan*, 536 U.S. 101, 115 (2002). Under the equitable continuing violation doctrine, "[p]rovided that an act contributing to the claim occurs within the filing period," the claim is timely and the entire period of the hostile work environment may be considered for the purpose of determining liability. *Id*. at 117.

LMV argues that the post-amendment MHRA applies because Weaver's hostile work environment claim did not accrue until the last act occurred on which Weaver relies to assert the claim, which was in October 2017 shortly before she was terminated. LMV argues that Weaver cannot have it both ways; that, although she could rely on the "continuing violation doctrine" to show that her hostile work environment claim was timely (even though she began to experience racial hostility at LMV in early 2016 and did not file her charge with the MCHR until February 8, 2018, or her petition until October 13, 2018), Weaver cannot at the same time argue that her claim vested in 2016. We disagree.

LMV's argument conflates the issue of whether a hostile work environment claim has been timely filed for purposes of the statute of limitations with the issue of when the injury occurred so as to vest her interest in the claim for purposes of which substantive law applies. The timeliness of Weaver's hostile work environment claim is not at issue in this case. The cases LMV relies on to urge that "accrual" for a hostile work environment claim occurs *only* upon the last act relied on to assert the claim do not address when the claim could *first* have been asserted but, instead, address whether an act contributing to the claim occurred within the filing period, in which case

9

"the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*

To determine the substantive law that applies to a hostile work environment claim, we do not look at the last act relied on to assert the claim for the purpose of determining the claim's timeliness. Instead we must determine when sufficient incidents "occurred" to constitute a hostile work environment under the reasoning of *Morgan*; that is, when the LMV workplace environment was sufficiently hostile that Weaver was injured and could have sued if she so chose. "As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has 'occurred,' even if it is still occurring." *Id.* at 117.

We conclude that Weaver had enough evidence to establish that she was injured by the cumulative effect of day-to-day harassment by August 11, 2016, when she described the ongoing racial hostility in explicit detail to LMV management in her email to McIsaac, which he shared with Hrasky. Ironically, that email also contains the reason she did *not* bring her claim then. Her objective was to enlist management's help in ending the hostility.

Whatever the reason Weaver did not pursue her hostile work environment claim as early as she could have, viewed in the light most favorable to Weaver's claim, Weaver was injured by a hostile work environment before August 28, 2017. There was evidence that prior to August 28, 2017, LMV employees wore hats and shirts bearing images of the Confederate flag; that Weaver and other African-American employees were subjected to "weekly, and lately daily" disrespect from white employees who refused to speak to Weaver, touch her, or even acknowledge her; that Weaver had to work harder or longer than white employees doing similar work—while she was being paid less—yet encountered a higher level of scrutiny from supervisors; and that a truck bearing a Confederate flag was frequently seen in the parking lot. After being told that LMV was

10

"not big on diversity," Weaver experienced her supervisor failing to give her credit for her ideas or allowing her to implement them. After Weaver complained to her supervisor about racism at LMV, he gave her a lower performance evaluation. That Weaver's version of the facts was denied by LMV witnesses is irrelevant; we view the evidence in the light most favorable to her. On that basis, Weaver had a vested right that could not be taken away by the retrospective application of the 2017 amendment. As a result, the substantive law that applies to her claim is the law in effect before August 28, 2017.

The trial court's finding that Weaver's claim is governed by the pre-2017 MHRA because most of the ongoing hostile acts occurred before the effective date of the 2017 amendments is simply another way of saying that Weaver's hostile work environment claim vested before August 28, 2017. Though vesting should not be determined based on a simple mathematical comparison of the number of harassing events before or after a particular date, in this case, as noted, sufficient evidence supports the trial judge's conclusion that because most of the harassing conduct predated the August 28, 2017 change in the law, Weaver's hostile work environment claim was subject to the pre-2017 MHRA.

LMV also argues that Weaver's claims are discrete acts, not the kind of interrelated events that support a hostile work environment claim. "Hostile work environment claims" differ from "discrete act" claims because a hostile work environment involves repeated conduct "where liability is based on the cumulative effects of individual acts." *Williams v. City of Kansas City*, 641 S.W.3d 302, 329 n.9 (Mo. App. W.D. 2021) (quoting *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 254 (Mo. App. W.D. 2012) (internal quotations omitted)). However, the one discrete act here—Weaver's termination—is not at issue. Although Weaver did claim her termination was a wrongful act, she made it the basis of her retaliation claim, and that claim is not part of this appeal. Although

11

LMV belittles Weaver's claims as a few random events over the course of two and a half years, it does not challenge the sufficiency of the evidence to support a hostile work environment claim. For us, the only issue is whether the evidence shows events occurring before August 28, 2017, that gave rise to an injury as a result of a hostile work environment.

The trial court did not err in instructing the jury using the pre-2017 version of the MHRA. Point I is denied.

## II. The trial court properly applied the pre-2017 version of the MHRA in entering judgment for Weaver.

In its second point, LMV argues that the trial court erred in not applying the damage cap in § 213.111.4(2)(d), which was part of the amendments effective August 28, 2017. The determination of which law applies to a claim is a question of law that we review *de novo*. *State v. Horn*, 384 S.W.3d 338, 341 (Mo. App. E.D. 2012). As with its first point, LMV again argues that the trial court's error is based on its failure to recognize that Weaver's claim accrued after August 28, 2017. Section 213.111.4(2)(d) (2017) would have capped the actual and punitive damages award against LMV at $500,000, the limit for "a respondent who has more than five hundred employees in each of twenty or more calendar weeks in the current or preceding calendar year." Based on the reasoning outlined above, we disagree.

Weaver's damages occurred, and her claim vested, as explained above, before the MHRA amendments took effect on August 28, 2017. "Retroactively applying [§] 213.111.4's cap on the total amount of actual and punitive damages . . . , which accrued [before the MHRA's] August 28, 2017 effective date, would be unconstitutional." *Dixson v. Mo. Dep't of Corr.*, 586 S.W.3d 816, 827 (Mo. App. W.D. 2019). The previous version of the MHRA contained no damage caps. Therefore, the trial court properly overruled LMV's motion to amend the judgment to apply the damages cap that did not exist in the pre-2017 version of the MHRA.

Point II is denied.

### III. The trial court properly denied LMV's motion for judgment notwithstanding the verdict in finding that Weaver pled a submissible claim in her petition for hostile work environment.

In its third point, LMV argues that Weaver did not plead a claim of racial harassment or hostile work environment in her petition, thus failing to make a submissible claim, and that the trial court erred in not granting LMV's motion for judgment notwithstanding the verdict (JNOV). Submissibility of a claim is a question of law subject to *de novo* review, *Ellison v. Fry*, 437 S.W.3d 762, 768 (Mo. banc 2014), as is a trial court's ruling on a motion for JNOV. *Lewis v. Biegel*, 364 S.W.3d 670, 675 (Mo. App. W.D. 2012). LMV claims that under Missouri's "notice pleading" requirements, Weaver's petition, which fails to use the words "harassment" or "hostile work environment," does not adequately state a claim for hostile work environment. We disagree.

It is well settled that "a party cannot recover for a cause of action not pleaded." *Miken Techs., Inc. v. Traffic Law Headquarters, P.C.*, 494 S.W.3d 609, 612 (Mo. App. E.D. 2016) (quoting *Browning-Ferris Indus. of St. Louis, Inc. v. Landmark Sys., Inc.*, 822 S.W.2d 569, 571 (Mo. App. E.D. 1992)). But there is no requirement that a plaintiff use the explicit phrase "hostile work environment" in making this claim. *See Williams*, 641 S.W.3d at 323.[8] "[T]he nature of the pled cause of action is determined by the stated facts and requested relief, not by any invocation of the specific word 'harassment.'" *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 255 (Mo. App. W.D. 2020).

---

[8] In *Williams,* the "pleading" issue concerned whether the City had adequately pled its affirmative defense that Williams had failed to exhaust his administrative remedies; its support for that defense was a reference to "[a]ny of the factual allegations in Plaintiff's Petition which do not pertain to the particulars included in his Charge of Discrimination and Amended Charge of Discrimination have not been adequately exhausted." *Williams v. City of Kansas City*, 641 S.W.3d 302, 316, 318 (Mo. App. W.D. 2021) (holding such "bare legal assertions" insufficient).

Nevertheless, Missouri does require fact pleading, not merely notice pleading, thus the petition must include the facts that support the claim so as to "place [the employer] on notice of a hostile work environment claim." *Williams*, 641 S.W.3d at 318 n.4, 321. "The Court reviews the petition to see if the facts alleged, given their broadest intendment, meet the elements of a cause of action that is recognized or that might be adopted." *Baldridge v. Kansas City Pub. Schs.*, 552 S.W.3d 699, 716 (Mo. App. W.D. 2018) (quoting *Peters v. Wady Indus., Inc.*, 489 S.W.3d 784, 789 (Mo. banc 2016)). The pre-2017 version of the MHRA provided as follows:

> A successful claim of hostile work environment discriminatory harassment requires proof that[] (1) the plaintiff is a member of a group protected by MHRA; (2) the plaintiff was subjected to unwelcome protected group harassment; (3) the plaintiff's membership in the protected group was a contributing factor in the harassment; and (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment.

*Id.* (quoting *Fuchs v. Dep't of Revenue*, 447 S.W.3d 727, 732 (Mo. App. W.D. 2014)). Here, Weaver's petition alleged facts that support each element of a hostile work environment claim. Her petition alleged that she was an African-American woman and that, due to her race, she was paid less and given fewer responsibilities than white employees. She alleged that she complained to LMV management about discrimination within the plant and of racist emblems on-site at LMV, including Confederate flags and KKK symbols. She alleged that she was given a lower performance evaluation because she had complained about racism at LMV. The facts pled were those litigated at trial. Weaver's allegations of discrimination within the plant and of racist emblems on-site provide sufficient facts to put LMV on notice of an alleged hostile work environment.

LMV's reliance on *Tisch* for this point is misplaced. In *Tisch*, we affirmed the trial court's exercise of its discretion in refusing to allow the plaintiff to amend his petition, four days before trial, to include a hostile work environment claim. 368 S.W.3d at 251, 258. By that time, the only

surviving discrimination event left for trial was plaintiff's "refusal to promote" claim. *Id.* at 251

(the trial court had entered partial summary judgment on two claims, and the plaintiff voluntarily

dismissed another claim). However, every wrongful act plaintiff had alleged in his original

petition was "an individually significant 'discrete' event."[9] *Id.* at 255. After the entry of summary

judgment, the plaintiff wanted to use those same facts to support a hostile work environment claim,

using "essentially a new method of contesting the same issues that were ruled on in [employer's]

favor on summary judgment." *Id.* at 257. The trial court properly denied plaintiff's motion to

amend to include a hostile work environment claim based on the same discrete events that could

not support the series of interrelated events required by the continuing violation theory. *Id.* at 258.

Nothing remotely similar to *Tisch* occurred here; as explained above, Weaver alleged facts in her

petition to show the necessary series of interrelated events supporting the continuing violation

theory.[10]

The trial court properly overruled LMV's motion for JNOV, and Point III is denied.

**IV.    The trial court properly denied LMV's motion for JNOV in finding that the punitive damages award on Weaver's service letter statute claim was supported by clear and convincing evidence.**

In its fourth point, LMV argues that Weaver presented insufficient evidence to support the

jury's award of punitive damages on her claim that LMV violated § 290.140, the service letter

statute, which requires LMV to issue Weaver, upon her written request by certified mail, a letter

"stating for what cause, if any, [she] was discharged." § 290.140.1. The letter must be issued

within forty-five days of receiving the employee's request. *Id.* Under § 290.140.2, the employer

may be liable for "nominal and punitive damages" if the employer fails to issue the requested

---

[9] The *Tisch* plaintiff complained of a demotion, salary deduction, failure to promote, and failure to transfer. *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 255 (Mo. App. W.D. 2012).

[10] That Weaver also complained of other wrongful acts by LMV that might be considered "discrete" events is irrelevant.

letter. The jury's verdict awarded Weaver $1.00 in actual damages and $175,000.00 in punitive damages on her service letter statute claim, and the trial court entered judgment accordingly. LMV argues that, because it offered evidence that the service letter was written, signed by Hrasky, and ready to mail, there is insufficient evidence to support a punitive damages award. We disagree.

"To determine whether the evidence was sufficient to support the jury's verdict, an appellate court views the evidence in the light most favorable to the verdict." *Ellison*, 437 S.W.3d at 768. "A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." *Ellison v. O'Reilly Auto. Stores, Inc.*, 463 S.W.3d 426, 434 (Mo. App. W.D. 2015) (quoting *Howard v. City of Kansas City*, 332 S.W.3d 772, 788 (Mo. banc 2011) (internal quotations omitted)).

> In determining whether the evidence was sufficient to submit the claim for punitive damages, the evidence and all reasonable inferences are viewed in the light most favorable to submissibility. A submissible case is made if the evidence and inferences are sufficient to allow a reasonable juror to conclude that it is highly probable that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Id.* (internal citation omitted).

That Weaver requested a service letter is uncontroverted. Weaver offered evidence that she properly submitted her request for the service letter to LMV, and LMV acknowledges that it received the request. But Weaver testified that she never received the letter. In response, LMV offered evidence that Hrasky signed a service letter addressed to Weaver, that Hrasky emailed the letter to Clemens on January 25, 2018, and that Clemens gave it to unnamed assistants to mail. LMV offered no proof that the letter was in fact mailed or why it would not have been received by Weaver. The jury was free to conclude that the letter was never sent.

16

The jury also could have concluded that the letter was not "issued" as required by § 290.140.1. To "issue" the letter in compliance with § 290.140, the employer must not only deliver the letter to the employee but do so within the 45-day period after receiving the request. *Talbert v. Safeway Stores, Inc.*, 651 F. Supp. 1563, 1566 (W.D. Mo. 1987). Sending the letter, but failing to do so within the prescribed time, amounts to a failure to issue the letter, which subjects the employer to "punitive damages in proper cases." *Id.* (quoting *Heuer v. John R. Thompson Co.*, 251 S.W.2d 980, 987 (Mo. App. 1952)). Even if the jury accepted the inference that the letter was mailed, it is questionable whether LMV would have complied with the statutory 45-day time period.[11] Viewing the evidence in the light most favorable to the verdict, the jury could have concluded that LMV failed to issue the letter and thus is subject to punitive damages.

"However, an employer's mere failure to respond to a service letter request, by itself, is insufficient grounds to award punitive damages." *Callantine v. Staff Builders, Inc.*, 271 F.3d 1124, 1132 (8th Cir. 2001) (applying § 290.140). To be liable for punitive damages, a plaintiff "must show proof of malice." *Ruzicka v. Hart Printing Co.*, 21 S.W.3d 67, 76 (Mo. App. E.D. 2000) (citing *Ball v. Am. Greetings Corp.*, 752 S.W.3d 814, 822 (Mo. App. W.D. 1988) (defining "malice" as "whether the defendant did a wrongful act intentionally without just cause or excuse")). Proof of malice can come in the form of evidence, including inferences, used to support the employee's substantive MHRA claim. *Holmes v. Kansas City Mo. Bd. of Police Comm'rs*, 364 S.W.3d 615, 629 (Mo. App. W.D. 2012). "The rationale for allowing the jury to make reasonable inferences in determining liability for punitive damages is the same as that for the substantive claim: employers may act to prevent the development of direct evidence and a clear evidentiary trail of discriminatory intent is rare." *Id.*

---

[11] Trial exhibit 88, the certified mail receipt for Weaver's service letter receipt, is not part of the record on appeal, so it is unclear when LMV received her letter dated November 21, 2017.

17

LMV relies on *Johnson v. Rival Manufacturing Co.*, 813 S.W.2d 78 (Mo. App. W.D. 1991), to support its argument that there was insufficient evidence to support an award of punitive damages for failure to issue the requested service letter. In *Johnson*, the employer failed to issue a service letter because it claimed the employee's request for the letter was untimely based on a dispute about the date her employment ended. *Id.* at 81. The jury, accepting plaintiff's version of when her employment ended, found her service letter request timely.[12] *Id.* at 80 n.1. On appeal, the issue was whether there was "any evidence introduced by" the employee to support her claim that the employer was recklessly indifferent in failing to timely issue the requested service letter. *Id.* at 81. In support of her claim, the employee argued that because the jury believed her version of when her employment ended, an inference could be drawn that the employer was lying about her termination date, from which another inference could be drawn that, because the employer lied, malice must have been behind the failure to send the service letter. *Id.* However, the appellate court concluded such "surmise and conjecture" did not even support the inference of lying, much less malice. *Id.* An inference must "logically and properly follow from the facts." *Id.* We do not find the reasoning in *Johnson* controlling because the evidence of malice in the present case is much stronger.

Here, Weaver points to sufficient facts and inferences, covering many months of her employment, that logically support the jury's finding that LMV recklessly disregarded her rights under § 290.140 in failing to issue the service letter. By November 2017, when Weaver was fired, LMV management had sparred with her for well over a year about racial incidents and the racist atmosphere at LMV, all as detailed above regarding Point I. Hrasky called her August 2017 email

---

[12] Plaintiff testified that she did not quit her job in April 1987 when she told her employer to "take this job and shove it" but left work to have and recuperate from carpal tunnel surgery. *Johnson v. Rival Mfg. Co.*, 813 S.W.2d 78, 79 (Mo. App. W.D. 1991). The employer claimed that she had quit in April and, when she returned in August claiming she was still employed, the employer told her she no longer had a job. *Id.*

18

a "diatribe" that was too long to bother reading. Nothing changed at LMV, in spite of Weaver's complaints to Hrasky, McIsaac, and Clemens. Weaver eventually bypassed Clemens and Hrasky and emailed their supervisor, David Worrall, to tell him that the environment at LMV was "out of control and I need assistance." The jury could have relied on the facts and inferences supporting Weaver's substantive claim to determine that the two people responsible for writing the service letter, Clemens and Hrasky, recklessly disregarded her rights in not issuing the letter.

The jury was entitled to believe Weaver's testimony that she never received the requested service letter and from that to infer that it was not mailed. In light of evidence of a long period of tension between Weaver and her supervisors over her complaints of a racially charged working environment, the jury could have inferred that because of their frustration with Weaver, Hrasky and Clemens cared so little about mailing the letter that they did not mail it. Viewing the evidence in the light most favorable to the verdict, we deny Point IV.

## Conclusion

The judgment is affirmed.[13] We remand to the trial court to determine the appropriate amount of costs and appellate attorney fees to be awarded to Weaver's counsel.

_____
Karen King Mitchell, Presiding Judge

Cynthia L. Martin and Anthony Rex Gabbert, Judges, concur.

---

[13] Weaver filed a motion requesting attorney fees and costs on appeal. "Section 213.111.2 authorizes the court to award court costs and reasonable attorney fees to a prevailing party." *Walsh v. City of Kansas City*, 481 S.W.3d 97, 115 (Mo. App. W.D. 2016). "A 'prevailing party' includes one who prevails in an action brought under the MHRA, is awarded attorney fees by the trial court, and who successfully defends that favorable judgment on appeal." *Id.* Because LMV's liability for Weaver's MHRA claims has been affirmed on appeal, Weaver is the prevailing party. We therefore grant Weaver's request for reasonable attorney fees and costs and remand to the trial court to both determine the reasonableness of the sums requested and enter an appropriate award.

19